## TITLE INS. & TRUST CO. v. HISEY et al.
### No. 8591.

Circuit Court of Appeals, Ninth Circuit.
March 4, 1938.

---

Earl E. Johnson and Arch H. Vernon, both of Los Angeles, Cal., for appellant.

Bradner & Weil, of Los Angeles, Cal., for appellee Hisey.

Marshall Stimson and Noel C. Edwards, both of Los Angeles, Cal., for appellee Lake View Oil Co.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

This appeal is from a decree of the District Court perpetually enjoining forfeiture of an oil lease for any failure to comply with the drilling and testing requirements of the lease. No compensation for breach is involved.

The land involved is "The northwest quarter of Section 4, Township 11 North, Range 23 West, S.B.B.&M., containing 160 acres, more or less." Prior to August 11, 1934, this property was held in trust by the Title Insurance & Trust Company, hereinafter called the Trust Company, as trustee. Prior to November 18, 1927, the entire quarter section was under lease to Sun Park Oil Company, the Lake View Oil & Refining Company, hereinafter called the Oil Company, being a sublessee as to the southwest quarter. The main lease (and with it the sublease) by its terms expired April 9, 1930. Before the date of expiration and after considerable negotiation with other prospective lessees, a new lease as to the whole quarter section was entered into with the Lake View Oil & Refining Company. The new lease was executed by Carrie G. Parkinson (at that time the sole beneficiary of the trust) on November 18, 1927,

the property having been deeded to her by the Trust Company for that purpose. Immediately thereafter it was deeded back to the Trust Company, subject to the lease, to be held in trust. After commencement of the present proceedings, the Trust Company "acquired all the beneficial interest in the trust." Throughout the negotiations leading up to the new lease and until some time about September, 1931, J. J. Wilson was the attorney in fact and agent for the beneficiaries under the trust.

On May 8, 1931, Paul J. Hisey was duly appointed and entered upon his duties as receiver of the Lake View Oil & Refining Company, and on the same day entered into possession of the leased property and has operated it ever since. As such receiver he brought this action.

All of the foregoing facts were either stipulated to by the parties or are drawn from uncontradicted testimony.

It was stipulated that a document admitted in evidence was a true copy of the lease of November 18, 1927. The lease contains a forfeiture clause, the pertinent provisions of which are as follows:

"Time is the essence of this agreement.

"The lessee's interest under this lease shall be subject to forfeiture upon the conditions and in the manner hereinafter set forth, viz:

"If * * * (b) the lessee shall not have begun, in good faith, to remedy any such default (in the performance of any covenant, condition or agreement by it to be done or performed hereunder) within a period of fifteen (15) days after such notice (30 days notice of default), where it would be impracticable to cure such default within the thirty (30) day period,

"* * * (c) * * * then and in every case, this lease shall be and become invalid at the option of the lessor; and upon the lessor serving lessee with a Notice of lessor's election to declare this lease void, then lessee shall thereupon vacate said lands and surrender the same to the lessor. * * * But it is agreed that for the purposes of this lease, said premises shall be composed of Four (4) parcels, to-wit: the respective quarters of said Northwest quarter of said Section 4, and it is agreed that in the event a default in any covenant * * * affects only one of said quarters * * * and the lessor elects for said reasons to declare a forfeiture, then this lease shall become invalid as to that quarter * * * so affected, with the right of the lessee to retain possession of the remainder of said premises. * * *"

It was stipulated that on October 14, 1931, Paul J. Hisey, as receiver for the Oil Company, was served with a "Notice of Default" signed by the Title Company, which recited, as required by the forfeiture clause of the lease, alleged defaults in the performance of certain lease covenants. No question is raised as to the sufficiency of this notice, as such. On October 23, 1931, Paul J. Hisey, as receiver for Lake View Oil & Refining Company, filed a petition for an order restraining the exercise of a forfeiture. It is from the issuance of the order in response to this petition that the Trust Company has appealed.

The defaults specified in the mentioned notice all relate to certain drilling requirements. No default is claimed as to the northeast 40 acres of the quarter section, and it was stipulated that as to this quarter of the quarter section the drilling operations required by the lease were performed.

Though, as will be seen, there is no doubt that the lessee did not literally perform the drilling requirements of the lease, it is important to consider the claimed defaults in conjunction with the performance that was rendered, as bearing upon the claim of respondent that strict compliance with the terms of the lease was waived.

We will consider, as to each section separately, the requirements of the lease together with the operations stipulated to have been performed.

The lease required the Oil Company to comply with the following:

As to the southwest quarter:

(a) Drill two additional wells into and produce from the Kinsey sand, if oil can be produced therefrom in paying quantities; one of these wells to be not farther than 170 feet away from the north boundary of the premises.

Subsequent to the execution of the lease, wells Nos. 5 and 13 already in existence on the property were deepened to the Kinsey sand, well No. 5 coming in with a flush production of 200 barrels a day and well No. 13 coming in with a flush production of 120 barrels per day. Both of these wells are within 170 feet of the north boundary of the Southwest quarter.

Appellant contends that this covenant required the drilling of new and additional wells into the Kinsey sand and was never complied with. In view of the language of provision (d) (which we quote below), we do not believe that by the words "additional wells" as used in this clause new wells were intended. However, a determination of this point is, we think, unnecessary to our decision.

■ (b) Drill one well into the gusher sand.

Subsequent to the execution of the lease, well No. 17, already on the premises, was cleaned out and deepened, first to the Kinsey sand and then to the gusher sand, where it was found unproductive.

This operation indisputably constituted performance of the covenant.

■ (c) Drill one well so that it shall penetrate and test at least 1,000 feet of the brown shale.

Subsequent to the execution of the lease, well No. 11, already on the premises, was cemented off and redrilled down to the gusher sand, and then down to the Calitroleum sand, and then 150 feet into brown shale, and then put on production in the Kinsey sand.

This operation would not satisfy the requirement to test 1,000 feet of the brown shale.

As to the northwest quarter:

(d) One test of productivity made in the Kinsey sand in addition to wells which are then open in said sand upon said premises.

(e) One test well to be drilled at least 1,000 feet into the brown shale in said premises, unless brown shale test required in (c) made at a point not further south than 500 feet from the boundary line between the northwest quarter of the northwest quarter and the southwest quarter of the northwest quarter.

No drilling was done on the northwest quarter subsequent to the execution of the lease, and the brown shale test required in (c) was not made, so neither of these requirements were fulfilled.

As to the southeast quarter:

(f) One test to be made of the productiveness of the top sand.

No such test was made.

(g) One test to be made of the productiveness of the Kinsey sand.

It does not directly appear that such a test was ever made.

■ (h) One test to be made of the productiveness of the gusher sand.

Subsequent to the execution of the lease, well No. 7, already on the premises, was lying idle in the gusher sand and an effort was made to produce it, without result.

This operation sufficiently fulfilled the requirement.

(i) One test to be made of the productiveness of the Calitroleum sand.

No operation was undertaken to fulfill this requirement.

■ (j) One test to be made at least 1,000 feet into the brown shale, providing production in commercial quantities shall have been previously obtained from either well drilled into the brown shale on the west half of the quarter section.

Since no wells were drilled into the brown shale on either the northwest or southwest portions of the quarter section, this requirement, to quote from appellant's opening brief, "never became operative."

Summarizing, we find that as to the southwest quarter the requirements for a brown shale test have not been met, and that a doubt exists as to whether the Kinsey sand requirements have been fulfilled; as to the northwest quarter the requirements for a Kinsey sand test and for a brown shale test have not been met; and as to the southeast quarter the requirements for top sand test, Kinsey sand test, and Calitroleum sand test have not been met.

In view of the provisions of the lease and of the undisputed testimony of Lew Suverkrop, a petroleum engineer who had practiced his profession in the area since 1921, we find, as did the trial court, that a reasonable time for the completion on the southwest quarter of the drilling and testing requirements expired prior to April 9, 1930, and that a reasonable time for the completion on the northwest quarter and on the southeast quarter of said property of all the drilling and testing requirements relating to those portions of the property expired prior to October 10, 1931. Since the "Notice of Default" was served October 14, 1931, unless the fulfillment of these requirements was in some way excused, the Trust Company may properly forfeit the lease.

However, we hold that strict compliance with the terms of the lease was waived and that the performance rendered was accepted as sufficient by the lessor.

It is significant to note the reason given for the failure to carry out the covenanted drilling operations. The evidence is unchallenged that between September 24, 1925, and March 31, 1927, three wells known as the "Obispo" wells were drilled on section 32 (adjoining section 4 to the northwest) into the "brown shale" horizon and placed on quantity barrel production. And standard well 140 in section 5 (bordering section 4 on the west) was completed June 8, 1927, and came in at 1,200 barrels a day. Mr. Suverkrop testified without contradiction that "immediately following the bringing in of the last of the "Obispo" wells there was a lot of wild excitement * * * and scrambling for this brown shale production." It was under these circumstances that the lease of November 18, 1927, was executed.

Mr. Suverkrop further testified that by 1930 "[the] picture had entirely changed." A number of additional wells had been drilled in section 32, but "none of these, however, except two wells in the immediate vicinity of the discovery well obtained any commercial production. So that by 1930 the consensus was that this [the "Obispo" production] was just a freak that existed locally on the Obispo property and did not exist elsewhere in the field. * * * In 1930 no one would recommend, in view of the findings in exploring for the Maricopa shale through the area, drilling into the brown shale with any expectation of getting production." Since the Oil Company's drilling obligation as to the northwest and southeast quarters did not under the terms of the lease arise until after April 9, 1930, the foregoing recited change of circumstances is significant as to the treatment of the "brown shale" drilling provisions as to these portions of the property. They are further significant as to the southwest parcel (of which the Oil Company was in possession at the time of execution of the lease discussed). For, though the brown shale requirements as to this last-mentioned parcel arose some time prior to April 9, 1930, much of the data responsible for the "change of the picture" became available soon after execution of the lease in the form of a publication of the State Mining Bureau dated May, 1927, but stipulated not to have been published when the lease of November 18, 1927, was made.

A different explanation is offered for the failure to perform the various drilling requirements as they related to the "top," "gusher," "Kinsey," and "Calitroleum" sands. The unchallenged evidence reveals that after the execution of the new lease, but prior to the termination of the old lease, and before delivery of the additional territory to the Oil Company, the concerns occupying the various portions of the quarter section used every effort to get as much oil as possible before expiration of their leases. Mr. Wilson testified that "the field was very detrimentally affected by the activities of the other two companies endeavoring to obtain all possible during the term left." The evidence further reveals (by stipulation) that "subsequent to April 9, 1930, and prior to the date of the so-called notice of default of October 10, 1931, the well known as the P.W. No. 44, on the northeast quarter of the said northwest quarter of Section 4, was drilled * * * that the location of that well is 300 feet east of the boundary line between the northeast quarter and the northwest quarter of said northwest quarter of Section 4." It is evidenced by uncontested testimony that the P.W. No. 44 went into the "Kinsey," "Gusher," and "Calitroleum" sands and showed them to be unproductive. But it was further testified (by Mr. Suverkrop) that "The findings in Well No. P. W. 44 would not prove the absence of commercial production, in say, the Kinsey sand where a well is located like No. 7, either of wells Nos. 7 [No. 7 is located on the southeast quarter of the quarter section]." It was stipulated "That Calitroleum Well No. 2, [which lies near the northwest boundary of the southeast quarter of Section 4], and Well No. 1 [which lies on the northeast quarter of Section 4] adjoining the northwest quarter, were both water-logged in the Calitroleum sand at the time the lease here was executed, and still are water-logged." Relying on this fact and on the activity engaged in with respect to well No. 7 (outlined, supra) petitioner alleged that it was "conclusively proved that the sands required to be drilled [under provisions (f), (g), (h) and (i) were non-existent water-logged."

From the foregoing evidence we find that the drilling operations actually performed, taken in conjunction with other data available after the execution of the

lease, indicated that the carrying out of those provisions of the lease which have not been performed would have been a waste of money. This evidence would be of no import unless the facts thus revealed were known to the lessor. If known to him, they are important as indicating that the waiver which we find to have been made was a complete waiver of performance and not merely a waiver of time of performance.

Mr. J. J. Wilson, the lessor's agent, testified that he was furnished with a report as to the general "status of the field and its operation" and that he kept in "touch with the operations" on the lease from time to time. He further testified that he visited the field on "an average of three or four times a year," and on such occasions "observed what was going on in the matter of drilling and handling of this property as near as the surface indications can tell you." He communicated to the beneficiary and the trustee, in a general way, the information received by him from the figures and data furnished by the officers of the Oil Company. He further testified: "During all of this period I was receiving reports as to the status of these wells. They were monthly reports made to us in writing, telling us what wells were on production, what wells were down, and what work was contemplated or being done on the various wells. In that way we kept advised, I believe, even as to the drilling depths on the various wells then in operation."

Certain of Mr. Wilson's testimony indicates that as a result of his knowledge of conditions he concurred in the abandonment of the express drilling provisions. For example, he testified: "I did have discussions * * * with respect to the propriety of the operations they were conducting from time to time—discussions that had to do with the effect of certain drilling operations then engaged in by them on existing wells, and the danger of deepening certain old wells and of being able to probably cement off, and the desirability of drilling new wells having in mind the geological conditions as were disclosed by wells that were being drilled in adjacent properties. * * *" And again: "The matter of drilling Well P.W. No. 44 on the northwest quarter was discussed with me from the standpoint of the desirability to the lessor to locate a well on that quarter as near what would be the * * * very center of the 160 acres, for the reason that

there were no wells, either deep or shallow, drilled in that particular locality. * * *" And as to activities taken with respect to well 19 (on the southeast portion) he testified: "That well, if a success would determine the course of conduct that was to be followed by them and the field practice that they would follow with respect to the reconditioning of other wells in similar sands, in not only the section they were in possession of, but in that portion they would acquire upon the termination of the Interstate Lease." Finally, on redirect examination, he testified: "In the light of the language of the lease that called for test wells for productivity in the upper sand, in the gusher sand, and in the Calitroleum, and as a consequence of those particular pages of the lease, we had many discussions as to whether or not certain well operations that were then being conducted by the Lake View made the requirement of the provisions of the lease with regard to the testing of those sands, and even in the proper tests of the upper sand, in which an attempt was made to cement off one of those wells,—one old well to test the upper sand, and in turn, No. 19 was taken into the Kinsey sand, and then there was one well that was taken through to the gusher sand and later attempt to go through to the Calitroleum was a matter of question that was always a matter of discussion."

On the other hand, there is testimony to support the contrary contention that Mr. Wilson was under the impression that the drilling requirements were not immediately met because of lack of funds on the part of the Oil Company and that operations engaged in by them were designed to gain funds for the required deeper drilling.

Along this line is Mr. Wilson's testimony that " * * * we had a discussion shortly after the lease was executed with a view of ascertaining from the Lake View Company what they contemplated by way of their drilling, and subsequently in ascertaining what they had done they told me, * * * that they had entered into a contract with a man by the name of Fisher through which they hoped to be able to develop some shallow drilling that would put them in a better financial position to proceed with the deep drilling, and that the same man was financially able and, they were sure, would go ahead with the drilling obligations that they had. The detail of their arrangement with Fisher was not disclosed to me at that particular time."

**561**

Further evidence to support this view of Mr. Wilson's understanding of the purpose of the drilling operations that were carried on appears from his testimony as to his reports to one of the then beneficiaries of the trust: "My conversations with Mr. Hisey (not the Receiver) before his death and with Mr. Skinner with reference to the Fisher arrangement was to get money to get certain production from known rather shallow sands in order to place the Lake View in a financial condition to comply with this contract drilling program, as set forth in the lease; and, when the Fisher situation did not work out, I took it up with Mr. Merrill (an agent of the Trust Co.) with a view to enforcing the drilling program." However, it nowhere appears that prior to October 14, 1931, the date of service of the "Notice of Default," any objection was made as to the manner in which the obligations of the written lease were being performed or not being performed.

We need not decide whether the foregoing recited conduct is sufficient to establish a waiver on the part of the lessor, for a further and determinative act is yet to be considered. But we do decide from all the evidence so far treated, when coupled with the acceptance by the lessor of the rent of the premises, that we must find, as did the court below, "That by acts and acquiescence the lessor intended to and did waive the right to demand the strict enforcement of the said drilling and testing requirements as set forth in the lease * * *" rather than being required (as contended by appellant) to find merely that the lessor "waived the right to require * * * [the performance of] the drilling obligations of the lease within a reasonable time for their performance after securing possession of the property but * * * never waived its right to require the drilling obligations of the lease to be performed after notice to the lessee. * * *"

It was stipulated: "That at all times until September, 1931, all royalties under said lease of November 18, 1927, and under said prior lease were, with the full knowledge and consent of said Title Insurance and Trust Company paid to the beneficiaries in care of J. J. Wilson, their agent." Mr. Wilson testified that for some period of time these royalties were paid by the Oil Company to him for the account of the beneficiary in advance of their accrual in order to take care of tax obligations of the trust estate which were not

obligations of the Oil Company. It was further stipulated: "That on September 4, 1931, said Title Insurance and Trust Company, exercising its rights under said declaration of trust, demanded that all royalties on said lease be paid directly to it, and said Title Insurance and Trust Company commenced receiving direct payment of the royalty to it in September, 1931, and since that time royalties have been paid directly to and received by said Title Insurance and Trust Company each and every month up to the present time. * * *"

It was stipulated that prior to certain letters of April, 1934, and May, 1935, all royalty checks had been cashed to and including the check dated February 15, 1934, which covered royalty for the month of January, 1934. It does not appear that prior to the mentioned correspondence any agreement had been entered into allowing for nonprejudicial acceptance of rent. It was further stipulated that on September 10, 1931, the Oil Company paid delinquent taxes on the property at the demand of the Title Company, and that from that time through the year 1935 the amount of the taxes was paid by the Oil Company to the Trust Company.

It appears then that with full knowledge that the covenants of the lease had not, according to their terms, been performed and after the full reasonable time for their performance had expired and even after the notice of default had been served and for more than two years after the commencement of the present proceedings, the landlord accepted from the lessee the royalty payments due to it under the terms of the lease.

The California courts have settled beyond a peradventure of a doubt that "The acceptance of rent by the landlord from the tenant, after the breach of a condition of a lease, with full knowledge of all the facts, is a waiver of the breach, and precludes the landlord from declaring a forfeiture of the lease by reason of said breach." Kern Sunset Oil Co. v. Good Roads Oil Co., 1931, 214 Cal. 435, 6 P.2d 71, 73, 80 A.L.R. 453, and cases there cited. And the same California case definitely decided that a covenant to drill a certain number of wells on the leased premises is not a continuing covenant, and that consequently, "after the expiration of the time within which all of the wells were to be drilled and the full number had not been drilled, the covenant as a whole was then

breached, and a waiver of this breach would foreclose all rights of the plaintiff thereafter to a forfeiture of the lease by reason of said breach." Kern Sunset Oil Co. v. Good Roads Oil Co., supra, 6 P.2d 71, at page 75.

Appellant has attempted to distinguish the present case from the Kern Case, supra, upon the ground that here the evidence shows only a waiver of the time of performance, not waiver of the ultimate right to performance. While conflicting inferences may be drawn from the testimony, we hold the weight of the evidence to be that the waiver was without qualification. We are strongly moved to this conclusion by the unchallenged evidence relating to the geological data gained subsequent to the execution of the lease indicative of the futility of fully carrying out its drilling provisions.

Appellant also argues that in the Kern Case the royalties received came from a partial compliance with the drilling requirements of the lease, while here (it is contended) all the production upon which royalties have been paid was from producing wells as they existed at the time of the execution of the lease. Appellant cites Hyde v. Blaxter, 1924, 8 Cir., 299 F. 167, as authority for the validity of this distinction. That case involved no question of waiver nor does it appear from the facts that any royalties were ever paid under the lease there considered. It merely holds (as is clear) that forfeiture as to a portion of premises is proper where there has been a failure to comply with the drilling provisions of the lease as to that portion, even though large sums have been expended in compliance with drilling provisions relating to other portions of the tract. We are aware of no case that treats the source of rentals as determinative of the effect of their unconditional receipt by the landlord. Nor do we think that this fact may properly be considered determinative—the true basis of the rule is that the acceptance of the rents with full knowledge of a breach in the conditions of the lease is an affirmation that the contract of lease is still in force, which estops the landlord from demanding a forfeiture. 16 R.C.L. Landlord and Tenant, § 653, p. 1132.

Other contentions of appellant do not require extended discussion. For the purposes of our consideration, it is immaterial that the notice served by appellant was not a claim of forfeiture but only a preliminary "Notice of Default," since the ultimate question before us is whether a forfeiture may properly be asserted by the lessor. Nor is it significant that the "Notice of Default" was given but shortly after the reasonable time for the completion of the last of the lease requirements. The important question is, Were royalties accepted after the breach? The fact that there is an express statement in the lease that the drilling obligations are the consideration for entering into the lease is not a distinction having a bearing on this case. Whether expressed as consideration or not, lease covenants are binding on the lessee—unless, as in this case, their performance is waived. It is true that the drilling and testing covenants are independent, i. e., separate, from the covenant to pay royalties, but, whatever may be the rule as to other covenants and the effect of the acceptance of rent or royalty on the breach thereof, it is quite clear that, at least in California, a breach of the drilling covenants of an oil and gas lease is waived by the acceptance of rent with full knowledge of the circumstances.

Affirmed.